**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **LASHUN REW** | § | **PLAINTIFF** |
| | § | |
| | § | |
| **v.** | § | **Civil No. 1:19cv10-HSO-JCG** |
| | § | |
| | § | |
| **JASON VINCENT, _et al._** | § | **DEFENDANTS** |

<u>**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND**</u>
<u>**DENYING IN PART DEFENDANTS JASON VINCENT, SHAUN SEBRING,**</u>
<u>**DERRICK TOLBERT, AND NICHOLAS KEHOE'S MOTION [93] TO ASSERT**</u>
<u>**QUALIFIED IMMUNITY AND FOR SUMMARY JUDGMENT, AND**</u>
<u>**DISMISSING PLAINTIFF'S CLAIMS AGAINST DEFENDANT**</u>
<u>**DERRICK TOLBERT WITH PREJUDICE**</u>

BEFORE THE COURT is Defendants Jason Vincent, Shaun Sebring, Derrick

Tolbert, and Nicholas Kehoe's Motion [93] to Assert Qualified Immunity and for

Summary Judgment.  This Motion [93] is fully briefed.  After due consideration of

the Motion, related pleadings, the record, and relevant legal authority, the Court

finds that the Motion [93] should be granted in part and denied in part.  Plaintiff's

claims against Derrick Tolbert ("Officer Tolbert") will be dismissed with prejudice.

Plaintiff's claims against Defendants Jason Vincent ("Officer Vincent"), Shaun

Sebring ("Sergeant Sebring"), and Nicholas Kehoe ("Officer Kehoe"), will proceed at

this time.

# I.  BACKGROUND

A.   Factual background

1.   Arrest warrant and BOLO issued for Mr. Rew

On January 28, 2016, the Harrison County, Mississippi, Justice Court issued an arrest warrant for Plaintiff Lashun Rew ("Plaintiff" or "Mr. Rew") for the crime of "Carjacking (Armed) in violation of Mississippi Code Annotated 97-3-117(2)." Warrant [93-3] at 13; *see also* Aff. of Sgt. Sebring [93-3] at 2.  The Gulfport Police Department ("GPD") created and distributed alert bulletins, or "BOLOs,"[1] to its patrol officers to notify them of this outstanding warrant.  *See* BOLO [93-3] at 12; *see also* Aff. of Sgt. Sebring [93-3] at 2.

According to the BOLO, on January 28, 2016, "Rew brandished a blue and grey or silver semi-auto handgun, threatened to shoot the victim in the head and ordered the victim out of his . . . Cadillac Escalade," and then stole the vehicle as the victim fled.  BOLO [93-3] at 12.  The BOLO alerted officers that "Rew should be considered **ARMED AND DANGEROUS**."  *Id.* (emphasis in original).  In light of the warrant and BOLO, GPD officers were actively looking for Mr. Rew and visited locations he frequented.  *See* Aff. of Officer Vincent [93-5] at 3.

On February 16, 2016, GPD dispatch received a call from a female individual who requested police response involving a disturbance being caused by "Lashun Rew" in north Gulfport.  *See* Aff. of Sgt. Sebring [93-3] at 3.  Several GPD officers were dispatched to this area.  *See id.*  When officers arrived, they could not locate

---

[1] "BOLO" refers to "be on the lookout."  Aff. of Sergeant Sebring [93-3] at 2.

Mr. Rew, but the caller provided information that led them to believe that Mr. Rew could be found at 1500 Westward Drive in Gulfport. *See id.*; *see also* Sgt. Sebring's Incident Report [93-3] at 20. Sergeant Sebring drove to this address, a location with which he was already familiar because it was believed that Mr. Rew's wife, Kenyata Payne ("Ms. Payne"), was often found there. *See* Aff. of Sgt. Sebring [93-3] at 3-4.

2.   Officers' encounter with Mr. Rew

Sergeant Sebring was the first to arrive at the address and observed Mr. Rew and Ms. Payne enter the apartment. *See* Aff. of Sgt. Sebring [93-3] at 5.[2]  When Officer Kehoe arrived at the apartment, he approached the front porch area and an unidentified female came onto the porch, before he could knock. *See* Aff. of Officer Kehoe [93-4] at 2-4. When Officer Kehoe asked if Mr. Rew was inside, the female responded that he was not there, while at the same time nodding her head affirmatively, which indicated to Officer Kehoe that she was fearful of Mr. Rew learning that she had informed the officer of his presence. *See id.* at 4.

At this point, Sergeant Sebring reached the front porch area of the apartment. *See id.*; Aff. of Sgt. Sebring [93-3] at 5.   Because the door was open, Sergeant Sebring "gave numerous loud verbal orders through the open front door for occupants to exit the residence," and Ms. Payne's aunt, who had come to the front door, "similarly told everyone in the apartment to get out." *Id.*  Officer

---

[2] According to Mr. Rew's deposition, he arrived at the apartment about five to ten minutes before the officers and immediately went upstairs to use the restroom. *See* Pl.'s Dep. [93-8] at 139; *see also* Ms. Payne's Dep. [93-8] at 185. Ms. Payne testified in her deposition that she was not aware of the police officers' presence until later, when Sergeant Sebring knocked on the door a few minutes after Mr. Rew had gone upstairs, *see* Ms. Payne's Dep. [93-8] at 185-86.

Vincent and his assigned police K-9 "Skip" had arrived on the scene by this point. *See* Aff. of Officer Vincent [93-5] at 4.

According to Sergeant Sebring, Ms. Payne became very loud and argumentative inside the front doorway, claiming that one of the young female occupants was "scared of dogs." Aff. of Sgt. Sebring [93-3] at 5.  Sergeant Sebring viewed this as a means of obstructing and impeding his ability to locate and arrest Mr. Rew.  *Id.* at 5-6; *see also* Aff. of Officer Kehoe [93-4] at 5; Aff. of Officer Vincent [93-5] at 4.  Another GPD Officer, Nicholas Guilliot ("Officer Guilliot"), arrived and positioned himself at the rear of the building.  *See id.* at 4-5.  Sergeant Sebring continued to give loud verbal commands through the open door for everyone to exit the residence and even directed some orders specifically to Mr. Rew, calling him by name.  *See* Aff. of Sgt. Sebring [93-3] at 6.  He warned that officers were going to release the dog into the apartment.  *See id.*

Some occupants began exiting the building, but Mr. Rew and Ms. Payne did not.  *See id.*; Aff. of Sgt. Sebring [93-3] at 6; *see also* Aff. of Officer Kehoe [93-4] at 5. Sergeant Sebring has stated that Ms. Payne became increasingly belligerent and attempted to close the door on him several times, which he took as a physical effort to prevent him from arresting Mr. Rew.  *See* Aff. of Sgt. Sebring [93-3] at 7.  Ms. Payne then fled inside and went up the stairs to the second floor, at which point Officer Sebring spotted Mr. Rew at the top of the stairs.  *See id.*

Ms. Payne has testified that Office Sebring told her to go upstairs to get Mr. Rew, so she did.  *See* Dep. of Ms. Payne [93-8] at 186, 188, 189.  Mr. Rew recounted

4

in his deposition that, while he was still in the upstairs restroom, Ms. Payne

knocked on the door to alert him that the police were there for him.  *See* Pl.'s Dep.

[93-8] at 144; *see also* Dep. of Ms. Payne [93-8] at 190.  According to Ms. Payne, Mr.

Rew immediately exited the bathroom and began walking down the stairs.  *See* Dep.

of Ms. Payne [93-8] at 190.  Mr. Rew testified in his deposition that he came out of

the restroom with his hands up and was not offering any resistance.  *See* Pl.'s Dep.

[93-8] at 144.

3.   <u>Mr. Rew's apprehension</u>

Sergeant Sebring avers that he repeatedly ordered Mr. Rew to come

downstairs, but he refused to comply.  *See* Aff. of Sgt. Sebring [93-3] at 8.  Sergeant

Sebring ascended the stairs in an attempt to arrest Mr. Rew and described the

encounter as follows:

> I got to near the top of the stairs and grabbed Mr. Rew's right wrist as I
> moved him to face the side wall of the stairs so that I could then attempt
> to handcuff his hands behind his back.  Mr. Rew, however, tensed his
> right arm and immediately twisted his body away from me.  As he did
> so, he moved to a couple of steps (or stairs) below the second floor (on
> the stairwell) and now below me.  I was left in between Mr. Rew (below
> me on the stairs) and Ms. Payne (at the top of the stairs on the second
> floor).   As this was occurring, Ms. Payne advanced toward me still
> yelling and being belligerent.  My attention was diverted to Ms. Payne
> as I did not know her intentions and also did not know to what extent
> she would now interfere with efforts to arrest Mr. Rew, especially since
> I was in a very vulnerable position on a dimly lit and constrained area
> of the stairwell.
>
> As I viewed Ms. Payne as a threat to my safety, I quickly un-holstered
> and pointed my duty weapon toward her and ordered her to get back.
> While she continued to be loud and verbally belligerent, she backed up
> into a nearby room.  As I turned back toward where Rew was located
> below me, I observed that he was actually moving toward me up the
> stairs, which I took as an act of aggression under the circumstances, and

5

I feared for my safety.

*Id.* (paragraph numbering omitted); *see also* Aff. of Officer Kehoe [93-4] at 6.

Office Kehoe viewed Mr. Rew's quick ascension up the stairs "as an act of aggression toward Sergeant Sebring, who [Officer Kehoe] viewed as being in a vulnerable position at that moment . . . ." Aff. of Officer Kehoe [93-4] at 6. Officer Vincent also considered Sergeant Sebring's position to be a vulnerable one, and he yelled for Mr. Rew to come down the stairs. *See* Aff. of Officer Vincent [93-5] at 6. Mr. Rew "refused to comply, and instead quickly turned back up the stairs toward Sergeant Sebring." *Id.* According to Officer Vincent, he feared for Sergeant Sebring's safety and "reasonably believed that Rew posed an imminent threat of significant harm under the circumstances." *Id.*

Officer Vincent contends that he shouted once or twice that he was going to release the K-9. *See id.* As Mr. Rew approached within a step or two of Sergeant Sebring, Officer Vincent released Skip and yelled out commands for her to apprehend Mr. Rew. *Id.* at 7. Skip bit Mr. Rew's lower right leg. *See id.*; Aff. of Sgt. Sebring [93-3] at 8; Aff. of Officer Kehoe [93-4] at 7.

Mr. Rew purportedly continued to resist, despite officers loudly ordering him to stop resisting. *See* Aff. of Officer Kehoe [93-4] at 7; Aff. of Officer Vincent [93-5] at 7. Mr. Rew "was continually attempting to kick the dog and trying to grab a hold of handrails along the stairs." Aff. of Officer Vincent [93-5] at 7. Officers Guilliot and Kehoe assisted the K-9 in pulling Mr. Rew down the stairs, who was actively resisting. *See* Aff. of Officer Kehoe [93-4] at 7; Sgt. Sebring's Incident Report [93-3]

at 20.

As Mr. Rew was being dragged down the narrow stairway, he reached toward and grabbed Officer Guilliot, which Officer Kehoe perceived as a threat.  *See* Aff. of Officer Kehoe [93-4] at 7.  Officer Kehoe was separated from Mr. Rew and Officer Guilliot by a banister, which hampered his ability to do much to assist, so he "quickly used a short-proximity strike to the nearest part of Rew toward [him], which in that instance was the side of his face, as an effort to stun him and to force his release of Officer Guilliot."  *Id.* at 7-8.  Mr. Rew then released Officer Guilliot. *See id.* at 8.

Mr. Rew disputes the officers' version of events on the stairway, stating in his deposition that after he was alerted to the officers' presence by his wife, he exited the upstairs restroom with his "hands up" and offered "no resistance."  Pl.'s Dep. [93-8] at 144.  According to Mr. Rew, Ms. Payne began walking down the stairs as directed by officers, and he did the same following a single request from them.  *See id.* at 144-45, 146.  Mr. Rew claims that when he was halfway down the stairs, he was attacked by several of the officers, even though he had his hands in the air.  *See id.*  Mr. Rew maintains that, prior to this alleged attack, he was complying with the officers' commands, was calm, and was not belligerent.  *See id.* at 147, 171.

Ms. Payne also testified that Mr. Rew was walking down the stairs with his hands up when the officers "snatched him off the stairs, and threw him on his stomach, and went to literally handling him kind of bad, saying all kind of vulgar language."  Dep. of Ms. Payne [93-8] at 186.  The officers purportedly "slammed"

7

Mr. Rew onto the ground on his stomach.  *See id.* at 193.

4.      Officers' attempts to handcuff Mr. Rew

According to Officer Kehoe's version of events, as Mr. Rew was being pulled down the stairs, Officer Kehoe positioned himself to the side and placed one of his handcuffs on Mr. Rew's right wrist.  *See* Aff. of Officer Kehoe [93-4] at 7; Officer Kehoe's Incident Report [93-4] at 24.  When Mr. Rew was finally off the stairs on the floor near the base of the steps, he deliberately tucked both of his hands under his body, even though Officer Kehoe was still holding the handcuffs which were on Mr. Rew's right wrist.  *See* Aff. of Officer Kehoe [93-4] at 8; Aff. of Officer Kehoe [93-4] at 7.

Mr. Rew had not been patted down or searched for weapons and was lying on his stomach, with both of his hands under his stomach.  *See* Aff. of Sgt. Sebring [93-3] at 9; Aff. of Officer Kehoe [93-4] at 8.  Officers had reason to believe that, based upon the BOLO, Mr. Rew was armed, and he was wearing loose-fitting jeans.  *See* Aff. of Officer Kehoe [93-4] at 8.  Officers Kehoe and Guilliot attempted to pull Mr. Rew's hands from under him in order to handcuff him.  *See* Aff. of Sgt. Sebring [93-3] at 9.

Several officers, including Officers Vincent and Kehoe, gave numerous commands to Mr. Rew to stop resisting and let the officers have his hands, but Mr. Rew continued to refuse to comply.  *See* Aff. of Officer Kehoe [93-4] at 8; Aff. of Officer Vincent [93-5] at 8.  Mr. Rew was actively kicking and using his left leg to clamp down on Skip's neck and head.  *See* Aff. of Officer Vincent [93-5] at 8.

Because Officer Vincent saw officers struggling with Mr. Rew and did not know whether Mr. Rew had a weapon in his waistband area, Skip maintained the hold on Mr. Rew's right lower leg.  *See* Aff. of Officer Vincent [93-5] at 8.

Mr. Rew was "twisting and contorting," making it difficult for the officers to handcuff him.  *See* Aff. of Sgt. Sebring [93-3] at 9.  Officer Kehoe then "used two (2) quick close proximate hand strikes to the nearest part of [Mr. Rew] to [Officer Kehoe] in this constant struggle, which happened to be his facial area."  Aff. of Officer Kehoe [93-4] at 8.  However, the strikes "had no apparent effect" on Mr. Rew, who "was still kicking and actively tussling around and refusing to show his hands while keeping them hidden under his body . . . ."  *Id.* at 9.

Officer Kehoe then used two quick "knee strikes" to the part of Mr. Rew's body that was nearest him, which was the side of Mr. Rew's face.  *Id.*  These so-called "knee strikes" did not involve Officer Kehoe using his kneecap, but instead, the lower portion of his thigh, above the kneecap.  *See id.*  According to Officer Kehoe's Incident Report, due to Mr. Rew's positioning, Officer Kehoe could not deliver strikes anywhere else on Mr. Rew's body.  *See* Officer Kehoe's Incident Report [93-4] at 24.  This caused Mr. Rew to release his hands, *see* Aff. of Officer Kehoe [93-4] at 9*,* and officers were able to handcuff Mr. Rew behind his back, *see id.*; Aff. of Sgt. Sebring [93-3] at 9.  Officer Vincent then commanded Skip to release Mr. Rew, but Mr. Rew still had Skip pinned with his leg, causing the dog distress.  *See* Aff. of Officer Vincent [93-5] at 8.  She was, however, able to free herself.  *See id.*

Mr. Rew's version of events differs significantly from that of the officers.  He testified that the officers placed him in handcuffs while he was walking down the stairs, but that they nevertheless proceeded to punch and beat him.  *See* Pl.'s Dep. [93-8] at 147.  When he reached the bottom of the stairs, the police dog attacked him as well and "locked on [his] leg."  *Id.* at 171; *see also id.* at 145, 173-174.  Mr. Rew claims that he was beaten further as he lay on the floor near the bottom of the stairs.  *See id.* at 148.

Ms. Payne likewise testified that Mr. Rew cooperated with the arresting officers, complied with every order, and presented no difficulty in being handcuffed. *See* Dep. of Ms. Payne [93-8] at 194.  She contends that, before Mr. Rew was handcuffed, Sergeant Sebring kicked him a couple of times in his legs, knocking him to the ground, and then kicked him again.  *See id.* at 198-99.  Three other officers were hitting Mr. Rew while Sergeant Sebring had his foot in Mr. Rew's back.  *See id.* at 200.

According to Ms. Payne, as soon as Mr. Rew was handcuffed and on the ground, Officer Vincent released the police dog.  *See id.* at 194.  When Officer Vincent released Skip, the other officers stood back and watched the dog "clamp" onto his leg.  *See id.* at 195.  Ms. Payne testified that the dog "clamped" onto Mr. Rew's leg for a "couple minutes" as officers were "just standing there" and "looking at the dog . . . bite his leg."  *Id.*

5.    Post-arrest incidents

After he was arrested, Mr. Rew was taken to a patrol vehicle, and Officer

Kehoe transported Mr. Rew to the GPD police station "where AMR responded to treat Rew for his injuries."  Sgt. Sebring's Incident Report [93-3] at 20; *see also* Aff. of Officer Kehoe [93-4] at 11.  Mr. Rew was then taken to Memorial Hospital "where he refused any medical treatment."  Sgt. Sebring's Incident Report [93-3] at 20; Memorial Doc. [93-8] at 69.  According to Sergeant Sebring's account, after Mr. Rew refused treatment at Memorial Hospital, he contacted Garden Park Hospital, which agreed to treat him.  *See* Sgt. Sebring's Incident Report [93-3] at 20.  Ultimately, Mr. Rew was transported to Garden Park and treated without incident.  *See id.*

Mr. Rew maintains that, instead of transporting him to the police station from the apartment, he was placed in an ambulance, and after the officers handcuffed him to the bed inside the ambulance, he was again beaten.  *See* Pl.'s Dep. [93-8] at 149.  Mr. Rew asserts that he suffered a swollen eye, two black eyes, a busted lip, and a bloody nose.  *See id.* at 158.

Mr. Rew recounts that an ambulance transported him from Memorial Hospital to a nearby store's parking lot, and while in the ambulance, with his hands handcuffed to each side of the gurney and his feet shackled, officers "beat," "punched," "kicked," "slapped", and "choked" him.  Pl.'s Dep. [93-8] at 160-62.  Officers then removed him from the ambulance and "roughed [him] up," *id.* at 163, and "hit [him] a few times," *id.* at 164.  When another ambulance arrived, Mr. Rew was placed in it and taken to Garden Park Hospital.  *See id.* at 163.

6.    Resisting arrest charges

Ms. Payne was arrested for resisting or obstructing arrest and for interfering

with or impeding the duties of a law enforcement officer.  *See* Aff. of Sgt. Sebring [93-3] at 9.  She was later convicted of these charges.  *See id.*; J. [93-12] at 7, 8.

Mr. Rew was also charged with resisting arrest, in violation of Mississippi Code § 97-9-73.  *See* Aff. of Officer Vincent [93-5] at 10; Criminal Aff. [93-5] at 17. On November 15, 2016, Mr. Rew pleaded guilty to this charge in the Municipal Court of Gulfport, Mississippi.  *See* Aff. of Officer Vincent [93-5] at 10-11; Aff. of Linda McCutchan [93-11] at 1-2; Pet. to Enter Guilty Plea [93-11] at 4-6.  However, upon the prosecutor's recommendation, the Municipal Court "REMAND[ED] TO FILE FOR 24 MONTHS OF GOOD BEHAVIOR AND PLEA ON OTHER CHARGES."  J. [99-9] at 1 (emphasis in original).

B.    Procedural history

On January 10, 2019, Mr. Rew filed a Complaint [1] in this Court, followed by an Amended Complaint [61], against Defendants Jason Vincent, Shaun Sebring, Derrick Tolbert, Nicholas Kehoe, Nicholas Guilliot, and the City of Gulfport, Mississippi (the "City").  *See* Am. Compl. [61] at 1-2.  The Amended Complaint advances claims against all individual Defendants[3] under the Fourth Amendment pursuant to 42 U.S.C. § 1983 for excessive force and bystander liability, or failure to intervene, and against the City for failure to train and supervise the officers.  *See id.* at 5.  The excessive force and bystander liability claims relate both to Mr. Rew's arrest as well to the alleged force exerted against him following his arrest.  *See id.* at 4.

---

[3] The Amended Complaint [61] does not specify whether the Defendant officers are sued in their individual or official capacities.

The individual Defendants invoked qualified immunity in their Answer [9], and the parties have conducted discovery on this issue.  *See* May 21, 2019, Text Order; Ans. [9] at 2; *see also* Ans. [84] at 2 (Answer to Amended Complaint). Defendants Officer Vincent, Sergeant Sebring, Officer Tolbert, and Officer Kehoe, in their individual capacities, have filed the present Motion [93] for Qualified Immunity and for Summary Judgment, which is fully briefed.  Officer Guilliot has not filed a motion for qualified immunity.

In Mr. Rew's Memorandum [100], he states that "[h]aving conducted discovery, Plaintiff will concede that Defendant Tolbert should be dismissed."  Pl.'s Mem. [100] at 14.  The Court will therefore grant the Motion [93] as to Officer Tolbert and Plaintiff's claims against him will be dismissed with prejudice.

## II.  DISCUSSION

A.  Relevant legal authority

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Dyer v. Houston*, 964 F.3d 374, 379 (5th Cir. 2020).  If the movant carries this burden, "the nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

In this case, movants assert that they are entitled to qualified immunity.

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quotation mitted).  Qualified immunity applies in situations where an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known at the time the conduct occurred.  *See Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam).

"The qualified immunity defense has two prongs: whether an official's conduct violated a constitutional right of the plaintiff; and whether the right was clearly established at the time of the violation." *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010).

> A qualified immunity defense alters the usual summary judgment burden of proof.  Once an official pleads the defense, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact issue as to whether the official's allegedly wrongful conduct violated clearly established law.

*Id.* (citations omitted).

In order to be clearly established, a plaintiff is not required to identify a case directly on point, but case law must place the statutory or constitutional question beyond debate.  *Garcia v. Blevins*, 957 F.3d 596, 600-01 (5th Cir. 2020).  "In excessive-force cases, police officers are entitled to qualified immunity unless existing precedent *squarely governs* the specific facts at issue." *Id.* at 601 (emphasis in original) (quotation omitted).  Because police officers are often required to make split-second judgments about the use of force in tense, uncertain, and rapidly evolving circumstances, a court must "judge the reasonableness of the force used

from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and must avoid second-guessing a police officer's assessment of the danger at the scene. *Garcia v. Blevins*, 957 F.3d 596, 602 (5th Cir. 2020).

While a plaintiff bears the burden of negating qualified immunity, all factual inferences are drawn in his favor. *Brown*, 623 F.3d at 253. A "plaintiff's factual assertions are taken as true to determine whether they are legally sufficient to defeat the defendant's motion for summary judgment." *Baldwin v. Dorsey*, 964 F.3d 320, 325 (5th Cir. 2020) (quotation omitted).

B.   Analysis

1.   The applicability of *Heck v. Humphrey*

In support of their request for summary judgment, movants argue that collateral estoppel and *Heck v. Humphrey*, 512 U.S. 477 (1994), bar Mr. Rew's claims based upon his guilty plea to the resisting arrest charge. *See* Mem. [94] at 10-11.

In *Heck,* the United States Supreme Court recognized that

> the hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments applies to § 1983 damages actions that necessarily require the plaintiff to prove the unlawfulness of his conviction or confinement, just as it has always applied to actions for malicious prosecution.

*Heck*, 512 U.S. at 486. Under *Heck*, a § 1983 plaintiff may not recover damages for any harm caused by actions whose unlawfulness would render a conviction or sentence invalid, unless a plaintiff proves the conviction or sentence has been invalidated. *See id.* If a court determines that a plaintiff's action, if successful, will

not demonstrate the invalidity of any outstanding criminal judgment, the action may proceed.  *See id.*

Mr. Rew pled guilty to a misdemeanor resisting arrest charge under Mississippi Code § 97-9-73.  *See* Aff. of Officer Vincent [93-5] at 10-11; Aff. of Linda McCutchan [93-11] at 1-2; Pet. to Enter Guilty Plea [93-11] at 4-6.  However, Mr. Rew has presented evidence that, on November 15, 2016, upon the prosecutor's recommendation, the Municipal Court "REMAND[ED] TO FILE FOR 24 MONTHS OF GOOD BEHAVIOR AND PLEA ON OTHER CHARGES."  J. [99-9] at 1 (emphasis in original).  The first question is whether Mr. Rew's guilty plea to this charge is sufficient to invoke *Heck*, which on its face refers only to a "conviction or sentence."  *Heck*, 512 U.S. at 486.

While the parties have not briefed what a "remand to file" entails, such a resolution appears, at least at first blush, similar to a deferred adjudication under state law.  In *DeLeon v. City of Corpus Christi*, 488 F.3d 649 (5th Cir. 2007), the United States Court of Appeals for the Fifth Circuit considered whether a plaintiff's § 1983 claims were barred by *Heck* where the plaintiff had been charged under Texas law with aggravated assault on a police officer.  The plaintiff had pleaded guilty and had received a deferred adjudication, and argued that the deferred adjudication did not constitute a conviction and that *Heck* did not bar his § 1983 claim.  *See DeLeon*, 488 F.3d at 651.

The Fifth Circuit first considered the Texas statute that permitted the state court to withhold adjudication of guilt and determined that even though the order in

that case did not constitute a formal judgment of conviction or a sentence, *Heck*'s favorable termination rule nevertheless attached to an order issued in such proceedings.  *See id.* at 654.  The Fifth Circuit looked beyond the "sentence or conviction" language in *Heck* and determined that an order deferring adjudication was the functional equivalent of a conviction or sentence and that such an order "is, at least, one stage in an ongoing state criminal proceeding, which *Heck*'s rationale might protect."  *Id.*  Thus, a deferred adjudication qualified as a "sentence or conviction" for purposes of *Heck.*  *See id.* at 652, 654.

Mississippi Code § 45-27-3(k)(vii) provides that one possible disposition of a case for an individual who has been arrested includes "[r]emand to the file," Miss. Code Ann. § 45-27-3(k)(vii), as opposed another available disposition of "verdict or plea of guilt," Miss. Code Ann. § 45-27-3(k)(ii).  Mississippi Code § 99-15-26 permits a municipal court in misdemeanor criminal cases to withhold acceptance of a plea and sentence upon completion of certain conditions, *see* Miss. Code Ann. § 99-15-26(1)(b), including "good behavior for a period not to exceed two (2) years," Miss. Code Ann. § 99-15-26(2)(a)(v).[4]  Upon successful completion of such court-imposed conditions, "the court *shall* direct that the cause be dismissed and the case be closed."  Miss. Code Ann. § 99-15-26(4) (emphasis added).[5]

---

[4] While this statute was amended in 2019, it appears that the provisions relevant to this case have not been amended since Mr. Rew's charge was remanded to file.  *Compare* Miss. Code Ann. § 99-15-26 (2019), *with* Miss. Code Ann. § 99-15-26 (2015), 2015 Miss. Laws Ch. 478 (H.B. 555).

[5] The statute further provides that

> [u]pon petition therefor, the court shall expunge the record of any case in which an arrest was made, the person arrested was released and the case was dismissed or the charges were dropped, there was no disposition of such case,

17

The Mississippi Supreme Court has explained that, "[i]n § 99-15-26 proceedings, the trial court never accepts the guilty plea and never imposes a sentence if the defendant fulfills the court-imposed conditions." *Wallace v. State*, 607 So. 2d 1184, 1187 (Miss. 1992).[6]  Instead, the statute "empowers a court to postpone the acceptance of a plea and the imposition of a sentence and to eventually dismiss the charges" upon the defendant's successful completion of certain conditions.  *Id.* at 1186; *see also* Miss. Code Ann. § 99-15-26 (1989).

In this case, the parties have not addressed whether the Municipal Court withheld acceptance of the plea and sentence under Mississippi Code § 99-15-26 when it imposed the condition of 24 months' good behavior and remanded the charge to the file.  *See* J. [99-9] at 1.  Movants' original Memorandum [94] only mentions *Heck* in passing, *see* Mem. [94] at 10-11, and does not address the fact that the charge was remanded to the file, *see id.*

If the Municipal Court did impose the good behavior condition under § 99-15-26, as it appears, Mr. Rew filed the instant § 1983 action on January 10, 2019, over two years after the judgment.  *See* J. [99-9] at 1; Compl. [1] at 1.  The parties have not supplied the Court with any additional information as to the current state of the

_____

or the person was found not guilty at trial.

Miss. Code. Ann. § 99-15-26(5).  There is no indication in the record that Mr. Rew has filed a petition for expungement in state court.

[6] Like the current version of the statute, the version in effect in 1992 permitted a court to withhold acceptance of the plea and sentence pending successful completion of conditions, including "good behavior for a period of time not to exceed one-half (1 /2) of the maximum sentence allowable for the crime committed by the defendant."  Miss. Code Ann. § 99-15-26(2)(d) (1989).  Upon successful completion of the court-imposed conditions, "the court shall direct that the cause be dismissed and the case be closed."  Miss. Code Ann. § 99-15-26(3) (1989).

resisting arrest charge, including whether Mr. Rew met the conditions imposed by the Municipal Court and whether that court directed that the case be dismissed. *See* Miss. Code Ann. § 99-15-26(4); *but see* Pl.'s Mem. [100] at 8 ("Presumably, the charge was, or at least should have been dismissed after 24 months.").

Movants' rebuttal Memorandum [105] argues that "[w]hile a formal judgment might not have been entered on the Municipal Court's docket, the Plaintiff did in fact enter an official guilty plea and confessed to the charge under oath." Mem. [105] at 8 (citing Ex. [93-11] at 4-6). They maintain that this constitutes a "conviction" under *Heck* and its progeny. *See id.* (citing *Boykin v. Alabama*, 395 U.S. 238, 242 (1969)).

If a defendant's motion for summary judgment introduces a "*Heck* trigger," then "the plaintiff is forced to muster proof of *Heck's* favorable termination requirement to avoid dismissal." *Hoog-Watson v. Guadalupe Cty., Tex.*, 591 F.3d 431, 435 (5th Cir. 2009) (citing *Brandley v. Keeshan*, 64 F.3d 196, 199 (5th Cir. 1995), *abrogated on other grounds by Wallace v. Kato*, 549 U.S. 384 973 (2007)). A plaintiff bears the burden of proving the favorable termination of the earlier criminal proceeding. *Id.* If a plaintiff alleges termination in his favor and submits "sufficient evidence," summary judgment is not warranted. *Id.*

The passage of over 24 months after the imposition of the good behavior condition before Mr. Rew filed this suit appears to place this case in a different posture than the deferred adjudication in *DeLeon*. *DeLeon* considered the deferred adjudication to be part of an ongoing criminal proceeding, *see DeLeon*, 488 F.3d at

655, while the 24-month period in this case expired prior to the filing of Mr. Rew's initial Complaint, which could, and likely should, have resulted in the dismissal of the criminal charge under state law. Indeed, the plain language of Mississippi Code § 99-15-26 states that upon successful completion of the court-imposed conditions, "the court *shall* direct that the cause be dismissed and the case be closed." Miss. Code Ann. § 99-15-26(4) (emphasis added).

While not directly on point, the Mississippi Court of Appeals has considered whether a plaintiff can pursue a state-law malicious prosecution claim arising out of a criminal charge that was "remanded to the file," where one of the elements of a malicious prosecution claim is "the termination of such proceeding in the plaintiff's favor." *Hyer v. Caruso*, 102 So. 3d 1232, 1236 (Miss. Ct. App. 2012) (quotation omitted). In that case, the state court held that because the plaintiff's simple-assault charges were "remanded to the file," this was sufficient to constitute a termination of the proceedings in the plaintiff's favor. *Id.* "Although [the plaintiff] was not actually acquitted, he was not convicted, and the charges were no longer being pursued." *Id.* This further supports the conclusion that a remand to the file does not constitute a "conviction or sentence" under *Heck*, 512 U.S. at 486, or an ongoing state criminal proceeding also protected by *Heck*, *see DeLeon*, 488 F.3d at 651. Movants have not adequately briefed this issue.[7]

Even assuming movants have done enough to implicate *Heck*, based upon the

---

[7] To the extent that movants have done enough to trigger *Heck*, Mr. Rew has demonstrated that fact questions exist as to whether there was a favorable termination on the resisting arrest charge. For this reason as well, summary judgment based upon *Heck* would not be appropriate at this time.

present record there remain fact questions as to precisely when Mr. Rew was effectively under arrest and subdued. [8]  Movants' request for summary judgment on this basis is not well taken and should be denied.

2.   Mr. Rew's pre-arrest excessive force claims

Turning to the merits of whether Defendants are entitled to qualified immunity, the Court must consider whether Mr. Rew has created a fact question as to whether the particular officer's conduct violated a constitutional right of Mr. Rew, and whether the right was clearly established at the time of the violation.  *See Brown*, 623 F.3d at 253.

A court must analyze each officer's actions separately if they have not acted in unison, and a plaintiff's qualified immunity claims should be addressed separately as to each individual defendant.  *Darden v. City of Fort Worth, Texas*, 880 F.3d 722, 731 (5th Cir.), *cert. denied sub nom. City of Fort Worth, Tex. v. Darden*, 139 S. Ct. 69 (2018).  *Id.*  Where a plaintiff alleges that defendants acted in unison, a court need not separately address the qualified immunity analysis for each officer.  *Amador v. Vasquez*, 961 F.3d 721, 727 n.5 (5th Cir. 2020).  In this case, because Mr. Rew asserts that the officers acted in unison at times, the Court will examine his excessive force claims in segments of time and consider whether the

---

[8] In considering excessive force claims where plaintiffs asserted that officers used excessive force after they had stopped resisting, the Fifth Circuit has held that "a claim that excessive force occurred after the arrestee has ceased his or her resistance would not necessarily imply the invalidity of a conviction for the earlier resistance."  *Bush v. Strain*, 513 F.3d 492, 498 (5th Cir. 2008); *see also Thomas v. Pohlmann*, 681 F. App'x 401, 407 (5th Cir. 2017).  Such claims are distinct and not barred by *Heck*.  *See Thomas*, 681 F. App'x at 407.  Movants have not addressed Mr. Rew's claims regarding the use of any excessive force after he was arrested.

actions of the officers involved in specific incidents should be considered separately or in unison.  *See id.*

In seeking summary judgment, movants argue that Mr. Rew's version of events is contradicted by the officers' dash-cam video recordings.  *See, e.g.,* Mem. [105] at 18.  The Supreme Court has instructed that at summary judgment, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).  Where a nonmovant's version of events is "so utterly discredited" by a videotape "that no reasonable jury could have believed him," a court should view the facts "in the light depicted by the videotape." *Id.* at 380-81.  The Fifth Circuit has cautioned that this standard "is a demanding one: a court should not discount the nonmoving party's story unless the video evidence provides so much clarity that a reasonable jury could not believe his account." *Darden*, 880 F.3d at 730.

In the present case, most of the officers' interactions with Mr. Rew occurred off camera, inside the apartment building.  While audio can be heard, it is not clear or obvious from the audio alone precisely what is occurring inside the apartment, particularly since the audio is often difficult to understand and interrupted by unrelated police radio chatter.  *See* Ex. "6" to Aff. of Sgt. Sebring [93-3] (conventionally filed DVD); Ex. "5" to Aff. of Officer Kehoe [93-4] (conventionally filed DVD); Ex. "4" to Aff. of Officer Vincent [93-5] (conventionally filed DVD).  The

Court cannot say that these videos afford so much clarity that a jury could not believe Mr. Rew's or Ms. Payne's accounts.  *See Darden*, 880 F.3d at 730.  For this reason, the Court must treat their version of events as true when viewing the summary judgment record.

a.   Mr. Rew's excessive force claim against Officer Vincent

Officer Vincent claims that Mr. Rew refused to comply with officers' commands and that he feared for Sergeant Sebring's safety at the time he released Skip, *see* Aff. of Officer Vincent [93-5] at 6-7, but the deposition testimony of Mr. Rew and Ms. Payne differ significantly from that of Officer Vincent.  Mr. Rew testified that he came to the stairwell, put his hands up, walked down the stairs voluntarily, and was cooperating with police when the officers placed him in handcuffs and proceeded to beat and punch him.  *See* Pl.'s Dep. [93-8] at 147.  According to Mr. Rew, as officers were beating and punching him, the police dog attacked him.  *Id.* at 145, 173; *see also id.* at 171.

Ms. Payne also testified that Mr. Rew cooperated with officers and that, as soon as Mr. Rew was handcuffed on the ground, Officer Vincent released the police dog.  *See* Dep. of Ms. Payne [93-8] at 194.  Ms. Payne testified that the dog "clamped" onto Mr. Rew's legal for a couple of minutes, until Officer Vincent made the dog release.  *See id.* at 195.

At the time the conduct in this case occurred in February 2016, neither the United States Supreme Court nor the Fifth Circuit had specifically addressed what constitutes reasonable use of K-9 force during an arrest.  *See Shumpert v. City of*

*Tupelo*, 905 F.3d 310, 321-22 (5th Cir. 2018), *as revised* (Sept. 25, 2018), *cert. denied*, 139 S. Ct. 1211 (2019) ("At the time of the challenged conduct [in June 2016], neither the United States Supreme Court nor this court had addressed what constitutes reasonable use of K9 force during an arrest.").  After that date, on December 27, 2016, the Fifth Circuit decided *Cooper v. Brown*, 844 F.3d 517 (5th Cir. 2016), which specifically addressed the issue.

While *Cooper* was not decided until after Mr. Rew's arrest and the permissible level of the use of K-9 force in certain specific situations may not have been clearly established at that time, the law was "clearly established" that "once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive." *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015); *see also Ramirez v. Martinez*, 716 F.3d 369, 379 (5th Cir. 2013) ("Lawfulness of force . . . does not depend on the precise instrument used to apply it.") (quotation omitted).  "[T]he measured and ascending use of force is not excessive when a suspect is resisting arrest—provided the officer ceases the use of force once the suspect is subdued." *Shumpert*, 905 F.3d at 323.  Following this logic, *Cooper* found that the plaintiff's right was clearly established, despite there not being a controlling case directly on point, because controlling caselaw made "certain that once an arrestee stops resisting, the degree of force an officer can employ is reduced." *Cooper*, 844 F.3d at 524.

Deploying a police K-9 and ordering him to "retrieve" a suspect by his leg undoubtedly constitutes use of force. *See, e.g., Cooper*, 844 F.3d at 525.  Construing

the record evidence in Mr. Rew's favor at summary judgment, as the Court must, particularly assuming the truth of his version that he cooperated with police and was handcuffed behind his back when Skip was released, Mr. Rew has created a fact question as to whether Officer Vincent's conduct violated his clearly established Fourth Amendment right to be free from excessive force.  While his armed carjacking charge was severe, he posed no immediate threat to the safety of the officers or others once he was subdued, and he was not actively resisting arrest or attempting to evade arrest at the time Officer Vincent deployed Skip.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989).  Summary judgment in Officer Vincent's favor on the excessive force claim would not be appropriate on the present record.

b.      Mr. Rew's excessive force claim against Sergeant Sebring

Sergeant Sebring avers that the only times he came into physical contact with Mr. Rew were when he attempted to place Mr. Rew under arrest near the top of the stairs, when he attempted to pull Mr. Rew's hands from under his body while Mr. Rew resisted, when he assisted in handcuffing Mr. Rew, and when he placed Mr. Rew in the police vehicle.  Aff. of Sgt. Sebring [93-3] at 10.  Mr. Rew claims that the officers placed him in handcuffs as he was walking down the stairs, but proceeded to punch and beat him, even though he was complying with their orders.  *See* Pl.'s Dep. [93-8] at 145, 147, 173; *see also id.* at 171.  Mr. Rew contends that he was beaten further while he was on the floor near the bottom of the stairs.  *See id.* at 148-49.

Ms. Payne likewise testified that Mr. Rew cooperated with the arresting

officers, complied with their every order, and that there was no difficulty in Sergeant Sebring handcuffing Mr. Rew behind his back.  *See* Dep. of Ms. Payne [93-8] at 194.  Ms. Payne stated that, before Mr. Rew was handcuffed, Sergeant Sebring kicked him a couple of times in his legs, knocking Mr. Rew to the ground, after which Sergeant Sebring kicked Mr. Rew again, placed his foot in Mr. Rew's back, and handcuffed him.  *See id.* at 198-99.  At this point, three other officers were also hitting Mr. Rew.  *See id.* at 200.

At summary judgment, the Court may not weigh the evidence, but must determine whether there is a genuine fact issue for trial.  *See Cadena v. El Paso Cty.*, 946 F.3d 717, 725 (5th Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  Considering the record evidence in the light most favorable to Mr. Rew at the summary judgment stage, the Court must assume that he was not actively resisting arrest or attempting to evade arrest when the force was exerted.  *See Graham*, 490 U.S. at 396.  If a jury were to accept as true Mr. Rew's and Ms. Payne's version of events, the Court cannot say that the degree of force purportedly used by Sergeant Sebring was objectively reasonable in light of clearly established law.

c.   Mr. Rew's excessive force claim against Officer Kehoe

Officer Kehoe admits that, as officers were attempting to handcuff Mr. Rew, he "used two (2) quick close proximate hand strikes to the nearest part of [Mr. Rew] to [Officer Kehoe] . . . , which happened to be his facial area."  Aff. of Officer Kehoe [93-4] at 8.  According to Officer Kehoe, the strikes "had no apparent effect" on Mr.

26

Rew, who "was still kicking and actively tussling around and refusing to show his hands while keeping them hidden under his body," *id.* at 9, so he then used two quick "knee strikes" to the part of Mr. Rew's body that was nearest him, which was the side of Mr. Rew's face, *id.*

As with Sergeant Sebring, if a jury accepts as true Mr. Rew's and Ms. Payne's versions of events, the degree of force employed by Officer Kehoe in deploying "hand strikes" and "knee strikes" to Mr. Rew's facial area after he had complied and was handcuffed, would not have been objectively reasonable in light of clearly established law. *See id.* A jury could conclude that the level of force Officer Kehoe used against Mr. Rew was unreasonable in relation to the threat he presented and the surrounding circumstances. *See Graham*, 490 U.S. at 396.

As to Officer Kehoe, movants also contend that, other than the dog bite on his leg, Mr. Rew suffered no injury, *see* Mem. [94] at 14, or merely *de minimis* injury, *see* Mem. [105] at 11-12, such that he has no claim under the Fourth Amendment.[9] However, the record includes testimony by Mr. Rew that he suffered other injuries, including a swollen eye, two black eyes, a busted lip, and a bloody nose. *See* Pl.'s Dep. [93-8] at 158. Based upon these disputes of material fact, the Motion for Summary Judgment must be denied as to Mr. Rew's excessive force claim against Officer Kehoe.

---

[9] In movants' rebuttal Memorandum [105], they also argue that Mr. Rew sustained only *de minimis* injury with respect the contact attributed to Officer Guilliot. *See* Mem. [105] at 11. However, Officer Guilliot has not filed a dispositive motion.

d.   Mr. Rew's claims for bystander liability or failure to intervene

The Amended Complaint advances bystander liability claims against the individual Defendants, alleging that they failed to intervene and stop the excessive force being exerted by other officers. *See* Am. Compl. [61] at 4-5. In 2013, the Fifth Circuit held that "an officer who is present at the scene and does not take reasonable measures to protect a suspect from another officer's use of excessive force may be liable under section 1983." *Whitley v. Hanna*, 726 F.3d 631, 646 (5th Cir. 2013) (quoting *Hale v. Townley*, 45 F.3d 914, 919 (5th Cir. 1995)). An officer may be liable under § 1983 on the basis of bystander liability where the officer "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." *Id.* (quotation omitted).

Movants did not specifically address Mr. Rew's bystander liability claims in their Motion [93] or original Memorandum [94]. For the first time in rebuttal, they argue that there can be no bystander liability when there is no violation of a federally secured right or when the officers exerting the force would be entitled to qualified immunity. *See* Mem. [105] at 22-23. Because movants did not raise these arguments until their rebuttal, their request for dismissal of the bystander liability claims should be denied for this reason alone. *See Dixon v. Toyota Motor Credit Corp.*, 794 F.3d 507, 508 (5th Cir. 2015) ("Arguments raised for the first time in a reply brief are waived.").

Even if the Court were to consider these arguments on their merits, based on

the current record the Court must deny the request because genuine disputes of material fact preclude summary judgment on Mr. Rew's excessive force claims. Construing the record evidence in Mr. Rew's favor, reasonable officers would have known that a fellow officer was violating Mr. Rew's Fourth Amendment rights.

3.   Mr. Rew's post-arrest claims

Defendants seek dismissal of all claims advanced against Officer Vincent, Sergeant Sebring, Officer Tolbert, and Officer Kehoe.  *See* Mot. [93] at 4.  However, their briefs only address claims related to Mr. Rew's apprehension and arrest, and they do not discuss Mr. Rew's post-arrest allegations regarding the continued use of force against him.  Because movants have not adequately invoked qualified immunity as to their post-arrest conduct, this portion of the Motion for Summary Judgment must also be denied.

## III.   CONCLUSION

To the extent the Court has not addressed any of the parties' arguments, it has considered them and determined that they would not alter the result.  The Motion [93] to Assert Qualified Immunity and for Summary Judgment will be granted in part and denied in part, and Mr. Rew's claims against Officer Tolbert will be dismissed with prejudice.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, Defendants Jason Vincent, Shaun Sebring, Derrick Tolbert, and Nicholas Kehoe's Motion [93] to Assert Qualified Immunity and for Summary Judgment is **GRANTED IN PART and DENIED IN PART**, and Plaintiff Lashun Rew's claims against Defendant

29

Derrick Tolbert are **DISMISSED WITH PREJUDICE**.  Plaintiff's claims against Defendants Jason Vincent, Shaun Sebring, Nicholas Kehoe, Nicholas Guilliot, and the City of Gulfport, Mississippi, will proceed.

      **SO ORDERED AND ADJUDGED**, this the 24th day of September, 2020.

*s/ Halil Suleyman Ozerden*
HALIL SULEYMAN OZERDEN
UNITED STATES DISTRICT JUDGE